IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

SHELTON CONWAY,
        Plaintiff,

v.                                                               Civil Action No. 3:03-CV-45
                                                               (Broadwater)
ANTHONY J. PRINCIPI, SECRETARY
OF THE DEPARTMENT OF
VETERANS AFFAIRS,
        Defendant.

**MEMORANDUM OPINION AND ORDER**
**AFFIRMING JUDGMENT FOR DEFENDANT**

      This employment discrimination action was filed by the plaintiff, Shelton Conway, an electrical worker at the Veterans Administration Medical Center [VAMC] in Martinsburg, West Virginia, alleging various violations of Title VII of the Civil Rights Act, including discrimination retaliation and a racially hostile work environment. Title 42, United States Code, Section 2000e, et seq. Prior to trial, the plaintiff's claim for intentional discrimination was dismissed, and at the conclusion of the testimony the Court directed a verdict for the defendant on the retaliation claim. The hostile work environment claim was then submitted to the jury. The jury found that, although the plaintiff had in fact been discriminated against on the basis of his race, the harassment was neither severe nor pervasive enough to constitute a hostile work environment. The matter is presently before the Court on the plaintiff's Motion for Judgment as a Matter of Law and Motion for a New Trial.

      On June 13, 2005, the parties appeared before the Court for a hearing on the plaintiff's motions and the defendant's responses thereto. Plaintiff disputes the finding by the jury that the racial harassment to which he was subjected was not sufficiently "severe or pervasive" enough to

constitute a racially hostile work environment. More specifically, he claims that judgment as a matter of law, or a new trial, should be granted because (1) the "appearance of hangman's nooses" in the workplace created an objectively hostile work environment as a matter of law; (2) the verdict is not supported by the evidence; and (3) the Court erred in its decision to exclude certain co-worker testimony as not relevant to the issue of a hostile work environment. For the reasons set forth below, the Court concludes that the plaintiff's motions should be denied.

## RELEVANT LEGAL STANDARDS

**A.      Motion for Judgment as a Matter of Law**

Under Rule 50 of the Federal Rules of Civil Procedure, the standard for granting a motion for judgment as a matter of law is stringent. See, Fox v. General Motors, Corp., 94 F.Supp. 2d 723, 724-25 (N.D.W.V. 2000) (citations omitted). In order to determine whether this standard has been met, the Court "must view the evidence, and all reasonable inferences to be drawn therefrom, in the light most favorable to the nonmoving party. Lack v. Wal-Mart Stores, Inc., 240 F.3d 255, 259 (4th Cir. 2001). The Court, furthermore, may not substitute its judgment for that of the jury or make credibility determinations. Price v. City of Charlotte, 93 F.3d 1241, 1249 (4th Cir. 1990). If there is evidence on which a reasonable jury could return a verdict in favor of the nonmoving party, that verdict must be upheld. Id. at 1249-50. Indeed, only in cases where there is "no legally sufficient evidentiary basis for the jury's verdict" is judgment as a matter of law warranted under Rule 50. Id. at 1250.

**B.      Motion for a New Trial**

Under Rule 59 of the Federal Rules of Civil Procedure, a new trial may be granted to prevent injustice, or when the verdict strongly conflicts with the great weight of evidence. While Rule 59,

in general, imposes a lower threshold for the granting of a new trial than does Rule 50, because the Court may reassess the evidence and need not view it in the light most favorable to the non-movant, the rule in the Fourth Circuit, as elsewhere, is that a new trial should not be granted unless: (1) the verdict is against the clear weight of the evidence, or (2) is based upon evidence which is false, or (3) will result in a miscarriage of justice, even though there may be substantial evidence which would prevent the direction of a verdict. Knussman v. Maryland, 272 F.3d 625, 647 (4th Cir. 2001); Atlas Food Sys. & Servs., Inc., v. Crane Nat'l Vendors, Inc., 99 F.3d 5787, 594 (4th Cir. 1996).

**DISCUSSION**

The plaintiff, who is a black male, began working as an "Electrician's's Helper" in the Electrical Shop at the VA Medical Center in Martinsburg, West Virginia sometime in 1997. He was hired for the position pursuant to an Upward Mobility Program at the VA, through which he was to receive on-the-job training, enabling him to eventually qualify as a W-10 Grade Electrician. Plaintiff was the first black to be hired as a full-time employee in the Electrical Shop, and he was also the only Electrical Shop employee who was, at the time, a participant in the Upward Mobility Program.

**I. Severity and Pervasiveness of the Defendant's Alleged Conduct**

*A. Hangman's Nooses*

The plaintiff argues that the "appearance of hangman's nooses" in his workplace created a racially hostile work environment as a matter of law. According to his testimony, on three separate occasions, a "hangman's noose" was found in the area of the Electrical Shop. The first purported "noose" was discovered on the engineering dock, draped over the edge of a cart in front of the emergency generator room. About a month later, another purported "noose" was found in the

Electrical Shop, lying on a bench, which was cluttered with an assortment of old materials, books and mechanical parts. The third purported "noose" was found in the hallway adjacent to the plaintiff's desk, lying on top of some boxes, which were also filled with miscellaneous mechanical parts, fixtures, and other items.

The defendant has consistently maintained, at each and every stage of the proceedings herein, that it certainly does not dispute, nor does it intend to minimize, the repugnant and inflammatory nature of the "hangman's noose" as a symbol of racial intimidation and hatred. In this respect, the defendant states that it is in accord with the premise of the Williams case cited by the plaintiff for the proposition that the "hangman's noose" is in and of itself a symbol of "this nation's opprobrious legacy of violence against African Americans." (See Williams v. New York Housing Authority, 154 F.Supp. 2d 820, 824 (2002)). However, the issue which the defendant has argued from the outset is not whether a "hangman's noose" is evidence of a racially hostile work environment, but whether the particular ropes at issue here were, in fact, ever intended to represent "hangman's nooses." The defendant asserts that they were not and presented substantial evidence to the jury in that regard.

The jury heard from several VAMC Electrical Shop employees who testified that the presence of ropes with "noose-like" knots has long been commonplace in this particular work area. Various witnesses testified as to the many ways in which such ropes were used. The Police Chief at the VAMC, himself an African American, testified that his office investigated at least two of these incidents, and that at no time did he ever believe the ropes were intended to represent "nooses." Nor did his investigating officer believe they were "nooses." Chief Kidrick, in fact, testified that he previously worked in the Engineering Department, and that ropes tied in precisely this fashion, with these very knots, were routinely used to pull the Cushman carts. There was also testimony from an

African American co-worker who said she had seen ropes like this on many occasions and never considered them as any kind of racial intimidation, stating that she knew they were used for many different jobs in the workplace.

Furthermore, despite the fact that he testified that these ropes were purported "nooses" specifically intended for him, the plaintiff never actually saw any of them. The defendant argued, and presented evidence, that if someone actually intended to use a "hangman's noose" to intimidate the plaintiff, it would have been a simple matter to place one in any number of locations where he would have actually seen it. None of these ropes, however, were hung up, or prominently displayed, despite the easy accessibility of numerous pipes throughout the entire workplace, including one above the plaintiff's own work station. Nor did he ever find one on his desk or at his locker. No offensive notes or drawings were found; nor was any racist graffiti ever discovered in the vicinity of these ropes. While the plaintiff claimed to be especially upset because the third purported "noose" was found in the vicinity of his work station, he also admitted that he had been working at his station that day and never saw it. Furthermore, co-worker Paul Satterfield testified that he believed he is actually the person who tied the knot in the third "noose" the previous day when he and a crew were using the rope on a job.

The Court further notes that during closing argument, counsel for the defendant specifically addressed the issue of racial harassment and intimidation through the use of "hangman's nooses." Defendant in fact conceded, in effect, that if there had been *any* evidence to support his claim that these ropes were, in fact, intended as such, the plaintiff's work environment would have indeed been a racially hostile one. There was substantial evidence to support the defendant's position that the plaintiff was not a target of racial animus in the form of "hangman's nooses," because these ropes

were not, in fact, ever intended as such. Accordingly, the question of whether the appearance of a "hangman's noose" creates an objectively hostile work environment, is not one which is properly before the Court for consideration in the context of this case.

### B. *Other Alleged Conduct by the Defendant*

The essence of the plaintiff's motions, insofar as they relate to the jury's determination that there was no racially hostile work environment, is that the verdict is contrary to, and not supported by, the evidence. In this regard, the plaintiff testified that from the time he first started working in the Electrical Shop, many of his white co-workers refused to work with him or to train him. The plaintiff's co-workers discounted his version of the way he was treated. Indeed, at least two of them, including Mr. Goldman, testified that they visited the plaintiff's home, at his invitation, to help him solve an electrical problem he was having with a boat and also to help him move. Another co-worker testified that the plaintiff, in fact, had invited all of the Electrical Shop employees to his wedding. Both supervisors and co-workers likewise testified that no one had ever refused to work with plaintiff.

The plaintiff also testified that his supervisor, Rick Goldman, had denied him a wage increase because he was black. He also claimed that because he was the only black employee in the Electrical Shop, he was singled out by Mr. Goldman to read a training manual entitled "Electrical Safety in the Workplace." At trial the plaintiff admitted that both Mr. Goldman and Mr. Goldman's supervisor told him that reading the book was part of his Upward Mobility training and that he would be credited accordingly. The testimony at trial established that at this particular point in time, the Upward Mobility Program within the VAMC was relatively unstructured and, that as a result, it was usually left to the individual supervisors to determine what kind of training would satisfy an

employee's Upward Mobility requirements. Mr. Goldman testified that since he himself had started in the Electrical Shop as an Upward Mobility employee, and had eventually advanced to the position of a supervisor, he had a firsthand understanding and appreciation of what specific kinds of training would help the plaintiff move ahead more quickly and achieve his stated goals. It was for this reason, Mr. Goldman testified, that he directed the plaintiff to read the manual. Goldman testified that when he tried to assess the plaintiff's progress, the plaintiff refused to discuss the material, and he also complained to Mr. Goldman's supervisors, and beyond, that he was being discriminated against based on his race because he had been singled out as the only employee required to read the manual. Several electricians who had been employed in the Electrical Shop at the time, however, testified that, in fact, all the electricians had not only been required to read the book but had been tested on it as well. When the plaintiff was the only member of the Electrical Shop who did not initially pass the test, it was Mr. Goldman who spent extra time working with the plaintiff until he eventually passed the test and received his Upward Mobility credit.

The plaintiff also testified that his whereabouts were monitored more closely than those of the white employees; that he received less favorable work assignments; that he was disciplined more harshly than white employees; and, that he was not selected for training on the Fire Alarm System. The defendant presented evidence to refute these claims, including testimony from both supervisors and co-workers, as well as records and various forms of documentation. A number of co-workers testified that during the time they were assigned to work with him, the plaintiff would often disappear from a job and simply never return. His supervisors testified that frequently the plaintiff was not where he was supposed to be, and that a great deal of time was spent trying to locate him. There were various reports of him sleeping on the job, including a written report by a member of the

nursing staff that the plaintiff had been discovered sleeping in a hospital room at a time when he was supposed to have been working on a job site. With respect to his complaint regarding Fire Alarm Training, the testimony established that the training took place in Florida and that only one certified electrician from the shop had been selected to attend. Plaintiff, at the time, was not a certified electrician, and accordingly was not even qualified to be considered as a candidate.

Another specific incident upon which the plaintiff relied to support his claim of a hostile work environment occurred when Mr. Goldman allegedly made a remark about a newspaper article which contained the ellipsis "n- - - - r" referring to the racial epithet "nigger." According to the plaintiff, a number of employees were present when Mr. Goldman pretended not to understand the ellipsis, and asked what the missing letters were. The plaintiff testified that Mr. Goldman then asked whether he would have to play "hangman" in order to figure out the word. Mr. Goldman testified that he thought he and the plaintiff were friends and that he, in no way, meant to offend him. In fact, while he acknowledged that the remark was made, he testified that he had not been the one who said it. In this regard, Mr. Goldman testified about incidents of religious prejudice and harassment which he had personally experienced and stated that he absolutely would never intentionally embarrass or humiliate someone else in such a fashion. The plaintiff conceded that neither Mr. Goldman, nor anyone else in the room for that matter, ever actually spoke the word "nigger." In fact, the plaintiff again admitted that in all his years as an employee of the Electrical Shop, he has never heard Mr. Goldman, nor any of his co-workers, use that word or any such racially offensive term. Several co-workers, who were also present, testified that, contrary to his testimony, the plaintiff did not appear to be upset by the incident. Nonetheless, he filed a complaint the following day. Mr. Goldman immediately apologized to him, but as both the plaintiff and Mr. Goldman testified, the plaintiff

chose not to accept it. When Mr. Goldman was given the option of stepping down as a supervisor or facing disciplinary proceedings relative to the incident, he stepped down from his supervisor's position and was replaced by Steve Cloud. The plaintiff testified that Mr. Cloud was no better as a supervisor than Mr. Goldman had been, and he felt he was being subjected to the same kind of discrimination and harassment under Mr. Cloud. In that regard, plaintiff's present supervisor testified that he hesitates to discipline the plaintiff or question his whereabouts because he does not want a racism complaint filed against him. His co-workers, likewise, testified if any of them avoided the plaintiff, it is not because he is black but because of his constant accusations of racism and his haste to file complaints alleging discrimination every time someone disagrees with him, speaks in a manner he does not like, or asks him to do something that he didn't want to do.

Finally, the plaintiff testified that for the past three years he has been getting phone calls at home, with no one on the other end when he answers. He claims that his tires have been slashed and that stone decorations at his home were crushed and vandalized. He was, however, unable to present any evidence as to who may be responsible for these acts. Indeed, he admitted that he has no knowledge whatsoever in this regard beyond his unsubstantiated belief that these events are somehow related to his lawsuit against the defendant.

The Court instructed the jury with respect to the factors it should consider in determining the severity of pervasity of alleged harassment, including (1) the frequency of the discriminatory conduct, (2) its severity, (3) whether it was physically threatening or humiliating, as opposed to simply an offensive utterance, and (4) whether it unreasonably interfered with the plaintiff's work performance. See, Harris v. Forklift Systems, Inc., supra, at 23; Ocheltree v. Scollon Productions, Inc., 335 F.3d 325, 333 (4th Cir. 2003). After considering all the evidence, the jury concluded that

the plaintiff was, in fact, harassed and that the harassment was based upon his race. The jury did not, however, find that the harassment had been severe and pervasive enough to constitute a racially hostile work environment. The nature of the verdict indicates that the jury carefully considered the evidence and the instructions of the Court. Certainly, when viewed in the light most favorable to the defendant, as the Court is required to do under a Rule 50 analysis, the evidence of record herein reasonably supports the verdict in favor of the defendant. Nor, under the Rule 59 standard, is the verdict herein one which is against the clear weight of the evidence, or based upon evidence which is false. Furthermore, there is certainly no miscarriage of justice likely to result from this verdict.

## II. The Court's Ruling to Exclude Certain Co-worker Testimony

The plaintiff claims that the Court's decision to exclude certain testimony proffered by Paul Binotto, one of the plaintiff's co-workers, constitutes reversible error and requires the granting of a new trial. According to the plaintiff, without Mr. Binotto's testimony the jury was unable to properly access the severity or pervasiveness of the hostile work environment.

Much of Mr. Binotto's testimony regarding racial aminus at the workplace consisted of statements and conduct which allegedly had occurred in the Electrical Shop prior to the time the plaintiff started working there. The court accordingly excluded this evidence as too remote and not relevant. Mr. Binotto claimed, for example, that there was "resistance" to having a black employee, specifically the plaintiff, come to work in the Shop, and further that Mr. Goldman had said a black would never be allowed to work there. Mr. Binotto also proffered unsubstantiated accusations about workers keeping tallies of blacks killed in Washington D.C., and a phony employment application filled in with racially offensive language and terms. He further claimed that Mr. Goldman's treatment of a black custodial worker was racist. Regardless of the basis for Mr. Binotto's

allegations the plaintiff has yet to show that he actually knew anything about these alleged incidents at the time they supposedly occurred. Since the subjective element of the hostile work environment test requires that the plaintiff himself must perceive his work environment to be hostile, events which occurred without his knowledge clearly cannot have contributed to his perception in that regard. Time line events which do not actually involve the plaintiff cannot be used as evidence to support his hostile work environment claim. See Nicole v. Grafton School, Inc, 181 F. Supp. 2d 475, 481 (D.Md. 2002).

While there are certain situations where conduct targeted at persons other than the plaintiff may be properly considered in support of a hostile work environment claim, this case dos not present such a situation. Indeed, such evidence is only admissible where the plaintiff can show that although it was not directed at him, it nonetheless did, in fact, affect effect his working environment. See Orenge v. Veneman, 218 F.Supp 2d 758, 768 (D. Md. 2002). In Orenge, the District Court considered offensive racist comments made by the plaintiff's supervisor to an employee other than the plaintiff as evidence in the plaintiff's hostile work environment claim because they reflected the nature of the workplace. In this regard, a supervisor's offensive language, although not directed at the plaintiff, but often used in his presence, is admissible if the plaintiff can establish a definite linkage between the hearsay or second-hand evidence and his work environment. See Walker v. Ford Motor Co., 684 F.2d 1355 (11th Cir. 1982) cited in Spriggs v. Diamond Auto glass, supra at 184. The Court finds there is no such linkage here. The events were remote in time to the plaintiff's employment and not relevant to his working environment.

Therefore, the Court hereby **ORDERS** that

    1) plaintiff's Motion for Judgment as a Matter of Law **(Docket # 44)** be DENIED;

    2) plaintiff's Motion for a New Trial **(Docket # 44)** be DENIED ;

    3) judgment for the defendant herein be AFFIRMED; and

    4) this case be stricken from the active docket of the Court.

ENTERED this **13th** day of September, 2005.

*/s/ W. Craig Broadwater*
W. CRAIG BROADWATER
UNITED STATES DISTRICT JUDGE